UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA

VS.                    CRIMINAL NO.  3:12cr00034-CWR-FKB

DYLAN WADE BUTLER, DERYL PAUL DEDMON,
AND JOHN PAUL RICE



SENTENCING HEARING



BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
FEBRUARY 10, 2015
JACKSON, MISSISSIPPI




APPEARANCES:

FOR THE GOVERNMENT:    MR. SHELDON BEER
                       MS. PAIGE FITZGERALD
                       MS. GLENDA HAYNES

FOR DEFENDANT BUTLER:  MS. ABBY BRUMLEY

FOR DEFENDANT DEDMON:  MS. CYNTHIA STEWART
                       MR. LEE AGNEW

FOR DEFENDANT RICE:    MR. SAMUEL MARTIN
                       MS. AMANDA MCKENZIE


REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012
_____
501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186

1    THE COURT:  Good afternoon, ladies and gentlemen.  Is

2   the government ready to call the case?

3    MR. BEER:  We are, Your Honor.

4    THE COURT:  You may proceed.

5    MR. BEER:  The government calls the case of *United*

6   *States of America v. Dylan Wade Butler, Deryl Paul Dedmon and*

7   *John Aaron Rice,* criminal number 3:12CR-34.  We are here to

8   commence the sentencing proceedings for all three defendants.

9   Sheldon Beer, Paige Fitzgerald and Glenda Haynes for the

10  government.  We are also joined at the counsel table by Special

11  Agent Hentschel of the FBI.

12    THE COURT:  Could you spell Mr. Hentschel's last name,

13  please.

14    MR. BEER:  H-E-N-T-S-C-H-E-L.

15    THE COURT:  Thank you.

16    MR. BEER:  The government is ready to proceed.

17    THE COURT:  All right.  And who do we have here for

18  the defendants?

19    MS. STEWART:  Your Honor, on behalf of Deryl Paul

20  Dedmon Cynthia Stewart and Lee Agnew.

21    THE COURT:  Okay.

22    MS. BRUMLEY:  Your Honor, on behalf of Dylan Butler

23  Abby Brumley.

24    MR. MARTIN:  Your Honor, on behalf of John Aaron Rice,

25  Sam Martin and Amanda McKenzie.

1      THE COURT:  We'll take Mr. Butler first and ask just

2  some preliminary questions.  Mr. Butler, you're here with your

3  lawyer today, Ms. Abbey Brumley.  Are you ready to proceed?

4      MR. BUTLER:  Yes, sir.

5      THE COURT:  Are you satisfied with the way in which

6  Ms. Brumley has represented you throughout the course of this

7  litigation?

8      MR. BUTLER:  Yes, sir.

9      THE COURT:  Did you receive the presentence report

10  that was prepared in your case, sir?

11      MR. BUTLER:  Yes, sir.

12      THE COURT:  Did you discuss that report with your

13  attorney?

14      MR. BUTLER:  Yes, sir.

15      THE COURT:  Were you able to -- did she allow you to

16  ask questions about that report and was she able to answer

17  those questions -- any questions that you had to your

18  satisfaction?

19      MR. BUTLER:  Yes, sir.

20      THE COURT:  Ms. Brumley, do you agree that you've

21  discussed the presentencing report with your client?

22      MS. BRUMLEY:  I do agree, your Honor.

23      THE COURT:  There has been a presentencing report

24  prepared in this matter.  Are there any objections to the

25  report from this defendant?

1          MS. BRUMLEY:  No, Your Honor.

2          THE COURT:  The court then will adopt the presentence

3    report as prepared, and I know the government had a motion that

4    was filed and that motion has been granted.

5          MS. BRUMLEY:  Thank you, Your Honor.

6          THE COURT:  And now I'll just take up the other two

7    defendants at this point in time.  Mr. Dedmon.  Mr. Dedmon,

8    you're here with your counsel, are you not?

9          MR. DEDMON:  Yes, sir.

10         THE COURT:  Are you satisfied with the way in which

11   your counsel has represented you throughout the course of this

12   litigation?

13         MR. DEDMON:  Yes, sir.

14         THE COURT:  Have you, sir, received a copy of your

15   presentence report?

16         MR. DEDMON:  Yes, sir.

17         THE COURT:  Did you discuss that presentence report

18   with your attorney?

19         MR. DEDMON:  Yes, sir.

20         THE COURT:  Did your attorneys allow you to ask

21   questions about that report and if so were you able to -- were

22   they able to answer any questions that you had to your

23   satisfaction?

24         MR. DEDMON:  Yes, sir.

25         THE COURT:  Ms. Stewart, do you agree that you

1    discussed the presentencing report with your client?

2              MS. STEWART:  Yes, Your Honor.

3              THE COURT:  Do you agree that you allowed him to ask

4    any questions about -- and you and your cocounsel were able to

5    answer those questions to his satisfaction?

6              MS. STEWART:  Yes, sir.

7              THE COURT:  All right.  Now, the report was prepared

8    in his case.  Are there any objections to this defendant's

9    presentencing report?

10             MS. STEWART:  No, Your Honor.

11             THE COURT:  Okay.  Thank you.  I'll take the next

12   defendant, Mr. John Aaron Rice.

13             MR. RICE:  Yes, sir.

14             THE COURT:  Are you here with your attorney?

15             MR. RICE:  Yes, sir.

16             THE COURT:  And are you satisfied with the way in

17   which your attorney has represented you throughout the course

18   of this litigation?

19             MR. RICE:  Yes, sir.

20             THE COURT:  Did you receive, sir, a copy of your

21   presentencing report?

22             MR. RICE:  Yes, sir.

23             THE COURT:  Did you and your attorney discuss that

24   presentencing report?

25             MR. RICE:  Yes, sir.

1          THE COURT:  Did he allow you to ask questions about

2     that report, and was he capable of answering those questions to

3     your satisfaction?

4          MR. RICE:  Yes, sir.

5          THE COURT:  Mr. Martin, do you agree that you

6     discussed the presentencing report with your client?

7          MR. MARTIN:  Yes, sir.

8          THE COURT:  That you were able to answer any questions

9     that he asked about the report?

10          MR. MARTIN:  Yes, sir.

11          THE COURT:  And a presentencing report has been

12     prepared in this case, and the plaintiff -- the defendant

13     submitted some objections that have been ruled upon.  Is that

14     correct?

15          MR. MARTIN:  Yes, Your Honor.

16          THE COURT:  All right.  Are you satisfied with the

17     presentence report?  Are there any additional objections --

18          MR. MARTIN:  No, sir.

19          THE COURT:  -- to the presentencing report?

20          MR. MARTIN:  No, sir.  We're satisfied with it.

21          THE COURT:  Okay.  Thank you, you, sir.  For the

22     record, each of these defendants were indicted under 18 USC

23     Section 371 which charges that the defendants knowingly and

24     willfully conspired with each other and some unknown

25     individuals at the time to willingly caused bodily harm with

1  the use of dangerous weapons or to attempt to cause bodily

2  injury to African-American persons in and around Jackson,

3  Mississippi, because of their actual perceived race and the

4  color of those persons.

5          And they were also indicted for a violation of

6  18 USC Section 249, which charged that these defendants and

7  others aided and abetted one another willfully causing the

8  bodily injury of James Craig Anderson who is an African

9  American by inflicting bodily injury upon him.

10         Now, the defendants all came to court several months

11  ago and pled guilty to the particular charges.  Today is the

12  day that they will receive their sentences.  The government

13  through the guilty plea there was certain agreements reached

14  between the government and each of these defendants.  So now

15  how does the government wish to proceed at this point?

16         MR. BEER:  Your Honor, if it pleases the court, at

17  this time I'd like to allow Ms. Barbara Anderson Young to give

18  a victim impact statement.  When she concludes that, I'd like

19  to read an impact statement from Mr. James Bradfield.

20         THE COURT:  I'm sorry.  I was ruffling my papers.  I'm

21  sorry.  The second person --

22         MR. BEER:  The second person that I would like to read

23  a statement from is James Bradfield.  Those are the two

24  witnesses that the government would have to provide victim

25  impact statements.

1    THE COURT:  All right.  You may proceed then.

2    MR. BEER:  Thank you.  The government then calls

3  Ms. Barbara Anderson Young.

4    (Witness sworn)

5    THE COURT:  You may be seated, Ms. Young.  I'm sorry.

6  Just speak -- you don't have to speak directly into the

7  microphone, but please be sure to speak loud enough for the

8  lawyers to hear you.

9    MS. ANDERSON:  Honorable Judge Reeves, through tears

10  and grief so heavy, our hearts can hardly bear.  These words

11  are written in the wake of our loved one, James Craig

12  Anderson's, death.  He unjustifiably suffered a severe beating

13  at the hands of these racist white youth.  Not satisfied with

14  the beating, their unsatiable thirst for the blood of an

15  innocent African American caused them to commit the hideous

16  shockingly evil murder of my brother driven by hatred, sewn so

17  deep in their black hearts.  It grew into a fatal plan that

18  reaped the end of James Craig Anderson's life while he

19  helplessly fought to stay alive.

20    James Craig Anderson was not alone that night.  The

21  lens of a camera recorded the entire murderous attack.  The

22  guilty were exposed in committing this violence toward an

23  innocent man.  Murdered just because he was an African

24  American.

25    My heart felt as if it were being torn from my body as

1    I watched.  I watched him stagger trying to hold on to life.  I

2    know as he was being beaten, he must have had terror wondering

3    why.  But maybe he knew his life would end at the hands of

4    these strangers with eyes full of hatred.  For what reason?

5    Why?  Why?  Craig must have seen the cold dark eyes of his

6    slayers.  He fell to his death, mangled and torn to pieces.

7    Just to know his life ended so violently at the hands of vile

8    and evil racists.

9         Then the revelation that they celebrated, exhibiting

10   no remorse, cold-hearted and callous.  God only knows if the

11   cameras had not been rolling how many innocent African

12   Americans might have been killed by this murderous gang.

13   Nearly 60 years after Emmett Till, 52 years after Medgar Evers,

14   51 years after Chaney, Goodman and Schwerner, four years after

15   my brother, a son, a family man, James Craig Anderson, and

16   others we don't even know about, all died at the hands of

17   racist white men.

18        These young whites carried their legacy and proved

19   that hatred and racism still lives.  Even those of you who

20   weren't there June 26, 2011, but knew of such evil deeds are

21   just as guilty.  "He who passively accepts evil is as much

22   involved in it as he who helps to perpetrate it.  He who

23   accepts it without protesting against it is really cooperating

24   with it," the words of the late Dr. Martin Luther King, Jr.

25        The Anderson family, my 89 year old mother, and the

world are traumatized both emotionally and physically by this senseless act of hate-filled violence. Through tears, our family yet grieves over our loved one, James Craig Anderson, praying from day one that justice would be done.

So we turned to the only consolation we know. The holy scripture comes with this assurance that, "God is angry with the wicked every day. If the wicked does not turn back, he will sharpen his sword. He bends his bow and makes it ready. He also prepares for himself instruments of death. He makes it ready. He makes his arrows into fiery shafts. Behold, the wicked brings forth inequity. Yes, he conceives troubles and brings forth falsehood. He made a pit and dug it out. He has fallen into the ditch, which he made. His trouble shall return upon his own head and, his violent dealing shall come upon his own crown." Psalm 7:11 through the 16th verses.

Yes, surely, surely the violence you committed against James Craig Anderson shall fall upon your own head. Nothing, nothing, can bring Craig back. Yet he lives in me and my family. You can't take that away. More than that, he too lives among you, the last to see him alive on this earth.

The story is told of a sailer who shot at an innocent albatross -- an albatross is a bird -- in Coleridge's Rime of the Ancient Mariner. As his punishment, he was forced the wear the carcass of this bird around his neck. James Craig Anderson's blood is on your hands. And as long as you live,

1  you will always be -- he will always be the albatross around

2  your necks.  You killed him.  You killed the loving and

3  thoughtful son, brother, family man.  You killed a human being

4  that God created.  You shed innocent blood.  Nothing can fill

5  the void that you have caused in our lives.

6       Vengeance is the Lord's.  He will repay.  The Anderson

7  family forgives, as Christians should.  We refuse to bear the

8  burden of hate because it is such, such a heavy load to carry.

9  We will leave it to our father in heaven to repay you all.  May

10  God have mercy on your sin and sick souls.

11       Thank you, Your Honor.

12       MR. BEER:  Your Honor, if it pleases the court, I'd

13  like to now have James Bradfield stand next to me at the podium

14  while I read a statement that he prepared.

15       THE COURT:  You may.

16       MR. BEER:  Thank you, sir.  Your Honor, James

17  Bradfield is the partner of James Craig Anderson.  He and James

18  Craig had been together for 17 years when Mr. Anderson was

19  killed.  Mr. Bradfield and Mr. Anderson were raising a little

20  boy at the time that Mr. Anderson was killed, and he asked me

21  to read some remarks that he prepared because he didn't think

22  he could get through it.  So at this time I'm going read the

23  words of James Bradfield.

24       To all the people that are being prosecuted in this

25  vicious hate crime, you all don't have a clue what you have

1  done to my family in committing this terrible crime.  I lost my

2  life-long partner of 18 years and our son, Demarius Bradfield,

3  lost his father of four years.

4         You see, James Craig Anderson was a great man.  He was

5  a man who loved his family and was a great provider to our son

6  and me.  We would take family trips, go to church together as a

7  family, and celebrate holidays, birthdays, anniversaries, and

8  reunion together.  We had a great life, and we miss him so

9  much.

10        Since his death, our lives have been turned upside

11 down.  I've had to seek mental therapy as I could not maintain

12 everyday life tasks.  Not to mention, I had to take a leave of

13 absence from my job.  Losing Craig was like losing me.  I had

14 to deal with our son asking why those people killed Craig.  He

15 knows and tells me, "Daddy, Craig was a good man."  "Daddy,

16 Craig wouldn't hurt anyone."  And, "I miss daddy."

17        But the question, "Daddy, why did they kill Craig," I

18 could not answer.  Listening to our son say he wants to sleep

19 with me because he doesn't want those people to get me, and him

20 saying he will protect me and I will protect him breaks my

21 heart.

22        Visiting Craig's gravesite was hard on me, but even

23 harder on our son.  Craig always had our best interest at

24 heart.  He paid the mortgage, car notes, our son's tuition and

25 he even had a college fund for our son.  Things have now

changed.  I am left with the struggle of being a single parent.

Filing bankruptcy was a struggle I never thought that we would

have to face.  As a parent, you always want the best for your

child, and Craig wanted the best for our son.  Our son was in

private school making As and Bs before Craig's death.  But

because I could no longer afford the tuition, I've had enroll

him in public school and now his grades have fallen

tremendously to Cs, Ds, and some Fs.

My heart get so heavy at times because I feel like a

failure because I couldn't keep up on the things Craig did for

us.  We were always there for each other.  We supported each

other, and we confided in each other.

After hearing over and over what you all did to my

partner, all can I do is cry, cry, and cry.  I wish I was there

to help protect him from you, but I wasn't.  You killed my

partner, and honestly I wish none of you would ever see

daylight again.  There is no room on earth for people like you.

How could you kill someone because of the color of

their skin or for any reason, for that matter?  You have no

right to take someone's life.  How would you all feel if a

severe penalty was imposed on you?  Honestly, that is really

what all of you need because one of you could have helped spare

my partner's life.  But since you chose not to do so, you all

need to spend the rest of your life in jail.

May God rest your soul.  Signed James Bradfield and

1    Demarius Bradfield.  Thank you, sir.

2         THE COURT:  Thank you, Mr. Beer.  I understand that

3    that's all the statements from the -- from any victims.  Is

4    that correct, Mr. Beer?

5         MR. BEER:  That is correct, sir.

6         THE COURT:  At this time I'm going to deviate from

7    what I usually do.  I usually do this a little bit before this,

8    but I want to place on the record the statutory provisions, get

9    a confirmation from the parties that these are the correct

10   statutory provisions and the guideline provisions prior to the

11   motions that were filed in each of these cases.  In other

12   words, I'm going to get a confirmation on the record that the

13   presentence report is correct.

14        For a violation of 18S USC Section 371, if the court

15   were to sentence these defendants under the statute, it could

16   impose a term of imprisonment from zero to five years.  Is that

17   correct for government with respect to Mr. Butler?

18        MR. BEER:  It is, sir.

19        THE COURT:  Do you agree, Mr. Butler?

20        MR. BUTLER:  Yes, sir.

21        MS. BRUMLEY:  We do, Your Honor.

22        THE COURT:  Thank you.  Under Count 2, Title

23   18 USC 249 a violation -- a sentence under the statute, the

24   court may impose a sentence from zero to life.  Is that

25   correct, to the government?

1        MR. BEER:  That is correct, sir.

2        THE COURT:  Mr. Butler, do you agree?

3        MR. BUTLER:  Yes, sir.

4        THE COURT:  All right.  Now, under the statute, the

5   court may impose a term of supervised release under the first

6   count of zero to three years, a term of supervised release

7   under the second count from zero to five years.  Do you agree,

8   Mr. Butler?

9        MR. BUTLER:  Yes, sir.

10        THE COURT:  And does the government agree?

11        MR. BEER:  We, do Your Honor.

12        THE COURT:  All right.  Under the statute, this

13   defendant, Mr. Butler, is ineligible for probation.  A fine can

14   be imposed for Count 1 for up to $250,000, and a fine may be

15   imposed under Count 2 for up to $250,000.  Have I stated that

16   correctly?

17        MR. BEER:  You have, Your Honor.

18        THE COURT:  And do you agree, Mr. Butler?

19        MR. BUTLER:  Yes, sir.

20        THE COURT:  All right.  The court is going to take up

21   restitution.  I'm going to grant the government's motion that

22   was filed with respect to restitution.

23        MS. BRUMLEY:  Your Honor, for purposes of the record,

24   I've spoken with my client, and he wishes to waive his

25   appearance at the restitution hearing.  I would ask that you

1   confirm that with him on the record.

2           THE COURT:  Okay.  The court is going to hold a

3   separate hearing in the future on restitution.  Mr. Butler,

4   your counsel has now announced that you have chosen not to be

5   present at that.  You're waiving your right to be present at

6   that hearing?

7           MR. BUTLER:  Yes, sir.

8           THE COURT:  Okay.  Thank you.  On each of these

9   counts, the court is required under the statute to impose a

10  special assessment of $100.  Is that correct to the government?

11          MR. BEER:  It is, sir.  One other matter with respect

12  to restitution.  As you can see from government's pleading, we

13  are asking that the court today order that restitution be found

14  in this particular case for all three defendant and just defer

15  the calculation of the amount until a later date.  That's

16  pursuant to the mandatory Victims Restitution Act.

17          THE COURT:  Thank you.  If I fail to do that at the

18  end, please remind me.

19          MR. BEER:  Yes, sir.

20          THE COURT:  All right.  Thank you.  Now, with respect

21  to the $100 special assessment to each count, Mr. Butler, do

22  you agree the court must impose that?

23          MR. BUTLER:  Yes, sir.

24          THE COURT:  Now, we operate in a world of sentencing

25  guidelines that have been enacted by Congress and that this

court has an obligation to consult, review, and even consider.
So under the guidelines prior to the government's motion, is it
the court -- is the court correct in saying that the guidelines
will provide that this defendant, Mr. Butler, that is, could
serve anywhere between 108 and 135 months?  This is prior to
the government's motion?

MR. BEER:  That is correct, sir.

THE COURT:  Does Mr. Butler agree?

MR. BUTLER:  Yes, sir.

THE COURT:  And under the guidelines, the court can
impose on Count 1 a term of supervised release for one to three
years and under Count 2 a term of supervised release from two
years to five years.  Do the parties agree that that's correct?

MR. BEER:  Yes, Your Honor.

THE COURT:  Under the guidelines, this defendant --
and I did not hear from you.  I'm sorry.  Mr. Butler, do you
agree that that's correct?

MR. BUTLER:  Yes, sir.

THE COURT:  Under the guidelines, this defendant is
ineligible for probation.  Is that correct?

MR. BEER:  That is correct, sir.

MR. BUTLER:  Yes, sir.

THE COURT:  And under the guidelines, this
defendant -- the court may impose a fine between $15,000 and
$150,000.  Is that correct?

1        MR. BUTLER:  Yes, sir.

2        THE COURT:  All right.  And the government agrees?

3        MR. BEER:  Yes, Your Honor.

4        THE COURT:  All right.  Under the guidelines, the

5   court must impose a special assessment for each count.  Is that

6   correct?

7        MR. BUTLER:  Yes, sir.

8        MR. BEER:  Yes, sir.

9        THE COURT:  All right.  I'm going do it a little bit

10  different for defendant Dedmon.  Under the statutory provisions

11  for the counts that have been brought against this defendant,

12  and I'll -- the defendant -- excuse me, the court may order

13  prison time from zero to five years on the first count and zero

14  to life on the second count.

15       He may receive zero to three years supervised release

16  and zero to five years for supervised release as far as the

17  second count.

18       Under the statute, this defendant is not eligible for

19  probation.

20       On Count 1 and Count 2, the court may impose a fine of

21  up to $250,000 per count.

22       Restitution will be ordered in an amount to be

23  determined later, and he could receive a special assessment

24  of -- he would receive a special assessment of $100 on each

25  count.

1       Have I correctly stated what the statute would say

2  about these charges with respect to defendant Dedmon?

3       MR. DEDMON:  Yes, sir.

4       MR. BEER:  That's correct.

5       THE COURT:  With respect to the guidelines that this

6  court must consult with, this defendant, who has been indicted

7  under 18 USC 249(a)(1)7(B), I believe, he could receive for

8  that under guidelines a sentence of 360 months to life in

9  prison.

10      Under Count 1 of the indictment, he could receive a

11  five-year sentence -- zero to five years.  Under Count 1 for

12  supervised release, it is one to three years, and Count 2,

13  supervised release two to five years.

14      Under the guidelines, this defendant is not eligible

15  for probation.  He could receive a fine of $25,000 up to

16  $250,000.

17      Restitution will be ordered and determined at a later

18  date, but on each count he must pay a special assessment of

19  $100 for each count.  Have I accurately stated the guideline

20  provisions as to defendant Deryl Dedmon?

21      MR. DEDMON:  Yes, sir.

22      MR. BEER:  Yes, Your Honor.

23      THE COURT:  All right.  Thank you.

24      MS. STEWART:  Your Honor, I'm not sure if this is the

25  appropriate time or not, but our client would likewise waive

1   his appearance at the restitution hearing.

2           THE COURT:  Okay.  Thank you.  Mr. Dedmon, your

3   attorney has just announced that when the court has its hearing

4   to hear the calculations or to determine the calculations of

5   what the restitution will be, you are waiving your right to

6   attend that hearing.  Is that correct?

7           MR. DEDMON:  Yes, sir.

8           THE COURT:  All right.  Thank you.  Thank you

9   Ms. Stewart.

10          With respect to defendant John Rice, the charges for

11  which he's been indicted under Count 1 under the statute, he

12  could -- the court could sentence him to a term of zero to five

13  years and under Count 2 zero to life.  The court can impose

14  supervised release under Count 1, zero to three years; Count 2,

15  zero to five years.  Under Count 1 he's eligible for probation

16  from one to five years.  Under Count 2, he is ineligible.

17          He may receive a fine under Count 1 for up to

18  $250,000.  In Count 2, a fine of up to $250,000.

19          Restitution would be determined at a later date, but

20  under the statute he would have to pay $100 per count.  Is that

21  a fair -- is that a correct statement, Mr. Martin, and to the

22  defendant?

23          MR. RICE:  Yes, Your Honor.

24          THE COURT:  Does the government agree?

25          MR. BEER:  That's correct, sir.

1          THE COURT:  Under the guidelines -- this is prior to

2     the motion that the court has taken up, but under the

3     guidelines this defendant or the charge this defendant -- a

4     sentence may be imposed under the guidelines for 210 months up

5     to 262 months.

6          Supervised release on the first count from one to

7     three years and on the second count two to five years after

8     he's served a particular -- a sentence.

9          Under the guidelines, this defendant is ineligible for

10    probation.

11         The court may impose a fine of $20,000 up to $200,000.

12         Restitution again will be determined and calculated at

13    a separate hearing, and he may -- he will have to pay a special

14    assessment of $100 on each count.  Have I stated that

15    correctly?

16         MR. BEER:  Yes, Your Honor.

17         THE COURT:  To the defendant, Mr. Rice, have I stated

18    that correctly?

19         MR. RICE:  Yes, sir, Your Honor.

20         THE COURT:  All right.

21         MR. MARTIN:  Your Honor, Mr. Rice, the same as the

22    other defendants, on the restitution hearing, he's waiving his

23    right to be there.

24         THE COURT:  Okay.  Mr. Rice, your counsel has just

25    informed the court that you wish to waive your right to attend

1    any hearing on the restitution issue.  Is that correct, sir?

2           MR. RICE:  Yes, sir, Your Honor.

3           THE COURT:  All right.  Thank you.  Now, the court

4    having gone through the presentencing report, I'm adopting that

5    presentencing report as the court's findings of fact.  Are

6    there any objections?

7           MR. BEER:  No, Your Honor.

8           MS. BRUMLEY:  No, Your Honor.

9           MR. MARTIN:  No, Your Honor.

10          MS. STEWART:  Not on behalf of Mr. Dedmon.

11          THE COURT:  All right.  Now, we're at the point does

12   the government wish to say anything else about any of the

13   matters?

14          MR. BEER:  No, sir.

15          THE COURT:  All right.  We're at the point now where

16   each defendant has the right to -- a right of allocution.  Each

17   defendant has that right.  The defendant -- as the court

18   advised the defendants at each of their guilty plea hearings,

19   the defendant may speak to the court, his lawyer may speak to

20   the court, both of them may speak to the court, or any one that

21   the defendant wishes to call to speak on behalf of him to tell

22   the court anything that the court should consider prior to

23   sentencing.  So I turn to Mr. Butler and his counsel.

24          MS. BRUMLEY:  Thank you, Your Honor.  Mr. Butler has,

25   as Your Honor is aware, has prepared a letter which has been

provided to the parties and to the court.  He wishes to read a

portion of that letter at this time, Your Honor.

MR. BUTLER:  I wish every day that I could take

everything back, not for myself but for the man who lost his

life and the family who lost a brother and son.  I've always

been the type person to help others and take up for others who

couldn't take up for themselves.  And that night I did not nor

did I act in a way that I was raised.

I was never raised to have a hatred for African

Americans.  Until this day, I still don't.  From a very young

age, I was taught to accept people for who they were on the

inside, not their appearance on the outside.  I was raised with

a black uncle, mixed cousins, and a guy I called my stepdad who

is also black.  I love them all very much, and they have

supported me through all this.

I struggled a great deal with at the death of

Mr. Anderson.  I was ashamed of what I had done and who I had

become.  I realize that I had to grow up and take

responsibility for my actions.  I had hurt a lot of people, and

I knew I had to fix the things that I -- fix the things in any

way possible.

But there's still some things you I can't fix.  For

instance, the Anderson family's pain and suffering.  I know

that myself being in jail can only bring them so much closure.

I wish every day that I could speak with them so that I could

1   tell them that from the bottom of my heart I am truly sorry.  I

2   cannot take everything -- I cannot take back everything that I

3   have done, but I hope and pray that maybe one day they can find

4   it in their hearts to forgive me.

5           Life is to too short to have hatred in your heart, no

6   matter how big or small.  It can tear you down and destroy

7   lives.  What I'm trying to say is I'm truly sorry.  I take full

8   responsibility for the things I've done, and I just hope that

9   one day I can get a chance to fix my mistakes.  Thank you.

10          THE COURT:  Thank you, Mr. Butler.

11          MS. BRUMLEY:  Your Honor, also when I provided this

12  letter to the court, it was accompanied by many letters in

13  support of Mr. Butler from friends and family, and I think the

14  one thing that you can see, there's a pattern in those letters,

15  and the pattern is that this was a shock to be everybody who

16  knew Dylan Butler that he was involved in something like that.

17          I've been doing this a long time, Your Honor, and I

18  have represented countless defendants.  And Dylan is one of the

19  few clients that I can say has truly owned his crime and his

20  conduct, and he has owned it from the very beginning.  And to

21  this day he struggles with what he did.  He shows truly very

22  deep remorse for his actions and his conduct, and this is

23  something that I believe he will deal with for the rest of his

24  life.  He's never going to forget what he did.

25          And while he may not have gotten out of the car, while

he may not have laid a hand on Mr. Anderson, he truly every day

has a struggle within himself wondering what he should have

done, what he could have done, and how he could have made

things different.

And I believe, Your Honor, that the person standing

before you today is not the same person that was there that

night.  I believe truly that the person standing before you

today would have done something and would have stopped that

heinous act.  And we just ask, Your Honor, that you consider

Mr. Butler's letter and his plea to Your Honor, the letters

written by families and friends, and, of course my letter, Your

Honor, and we ask for the lowest possible sentence.

THE COURT:  Thank you.  It is this court's typical

practice to turn to government.  If the government wishes to

respond in any way it may do so, but the defendant will have

the last word.

MR. BEER:  The government has nothing further, Your

Honor.

THE COURT:  Thank you.  Is that all from Mr. Butler,

Ms. Brumley?

MS. BRUMLEY:  It is, Your Honor.  Thank you.

THE COURT:  I now turn to Mr. Rice.  Mr. Rice, you

have the opportunity to tell the court anything that you wish

the court should hear and consider prior to imposing sentence.

You or your lawyer may speak or however -- and you may call

1  anyone on your behalf as well.

2       MR. RICE:  Yes, sir.  I'd just like the family to know

3  that I'm sorry from the bottom of my heart.  I wish I could

4  change anything that happened.  I wasn't raised a racist.  I

5  wasn't ever raised or taught any of that.  I just want you to

6  know I'm sorry from the bottom of my heart.

7       MR. MARTIN:  Your Honor, Mr. Rice will not be calling

8  any witnesses on his behalf.  His statement will stand for

9  itself.

10      THE COURT:  Okay.  Thank you.  I now turn to the

11  government.  Does the government wish to respond in any way?

12      MR. BEER:  No, sir.  Thank you.

13      THE COURT:  All right.  Now, I offer Mr. Dedmon an

14  opportunity to tell the court anything he wishes to the court,

15  he or his lawyer, that the court should consider prior to your

16  sentence.

17      MR. DEDMON:  I just want to tell the Anderson family

18  again how truly sorry I am.  That's it.

19      THE COURT:  All right.  Thank you.  Does the

20  government have any response with respect to this defendant?

21      MR. BEER:  No, Your Honor.  Thank you.

22      THE COURT:  All right.

23      MS. STEWART:  We have nothing further, Your Honor.

24      THE COURT:  Thank you.  Are there any additional

25  arguments from counsel for the government before the court

1    imposes sentence?

2             MR. BEER:  No, Your Honor.

3             THE COURT:  Are there any additional arguments or

4    statements from either of the defendants before this court

5    imposes sentence?

6             MS. BRUMLEY:  No, Your Honor, not for Mr. Butler.

7             MR. MARTIN:  As far as Mr. Rice, no.

8             MS. STEWART:  Not on behalf of Mr. Dedmon.

9             THE COURT:  All right.  Sentencing is by far -- I

10   think if you took a poll of all the federal judges and probably

11   even state court judges, it be probably be unanimous.  It is

12   one of the most difficult things that we have to do as judges,

13   and the thing that most of us -- the thing that we like least

14   about our jobs.

15            For the purposes of sentencing, you have to be

16   cognizant of several things:  The victim, the defendants, the

17   public.  You have to weigh all of those things during the

18   course of sentencing.  And for that reason, I have prepared my

19   own statement.  And I am going to allow the defendants --

20   typically I have them stand up, but this statement is a little

21   long.  So after which I will impose the sentence.

22            One of my former history professors, Dennis Mitchell,

23   recently released a book entitled, *A New History of*

24   *Mississippi*.  "Mississippi," he says, "is a place and a state

25   of mind.  The name evokes strong reactions from those who live

1  here and from those who do not, but who think they know

2  something about its people and their past."

3         Because of its past, as described by Anthony Walton in

4  his book *Mississippi:  An American Journey,* "Mississippi can be

5  considered one of the most prominent scars on the map of these

6  United States."  Walton goes on to explain that, "There is

7  something different about Mississippi, something almost

8  unspeakably primal and vicious; something savage unleashed

9  there that has yet to come to rest."  To prove his point, he

10  notes that of the 40 martyrs whose names are inscribed in the

11  national Civil Rights Memorial in Montgomery, Alabama, 19 were

12  killed here in Mississippi.  "How was it," Walton asked, "that

13  half who died did so in one state?"  The state that I call my

14  Mississippi, your Mississippi, our Mississippi.

15         Mississippi has expressed its savagery in a number of

16  ways throughout its history:  Slavey being the cruelest

17  example, but a close second being Mississippi's infatuation

18  with lynchings.  Lynchings were prevalent, prominent, and

19  participatory.  A lynching was a public ritual, even

20  carnival-like, within many states in our great nation.  While

21  other states engaged in these atrocities, those in the deep

22  south took a leadership role, especially that scar on the map

23  of America, those 82 counties between the Tennessee line and

24  the Gulf of Mexico, those counties which are bordered by

25  Louisiana, Arkansas, and Alabama.

Vivid accounts of brutal and terrifying lynchings in Mississippi are chronicled in various sources:  Ralph Ginzsberg's Burks' *100 years of Lynchings* and Without Sanctuary:  *Lynching Photography in America*, just to name two. But I note that on this very day today, the Equal Justice Initiative released a new study, *Lynching in America: Confronting the legacy Racial Terror*.  Apparently it too is a must read.

In *Without Sanctuary*, historian Leon Litwack writes that between 1882 and 1968 an estimated 4,742 blacks met their deaths at the hands of lynch mobs.  The impact this campaign of terror had on black families is impossible to explain so many years later.  That number, the 4,742, contrasts with the 1,401 prisoners who have been executed in the United States legally since 1976.  In modern terms, that number represents more than those killed in Operation Iraqi Freedom and more than twice those killed in Operation Enduring Freedom, which is the Afghanistan conflict.  More American casualties.  Turning to home, this number also represents 1,700 more than those who were killed in 9/11.

Those who died at the hands of mobs, Litwack notes, some were the victims of what we call legal lynchings, having been accused of a crime, subjected to a speedy trial and an even speedier execution.  Some were victims of private white violence, and some were merely the victims of "nigger hunts,"

murdered by a variety of means in isolated rural sections and

dumped into rivers and creeks.

"Back in those days," according to a black

Mississippian, describing the violence of the 1930s, "to kill a

Negro wasn't nothing.  It was like killing a chicken or killing

a snake.  The whites would say, 'niggers jest supposed to die,

ain't no damn good anyway so jest go and kill 'em.'  They had

to have," as one black Mississippian said, "a license to kill

anything but a nigger.  He was always in season."

Said one white Mississippian, "A white man ain't

a-going to be able to live in this country if we let niggers

start getting biggety."  And even when lynchings had decreased

in and around Oxford, one white resident told a visitor of the

reaffirming quality of lynchings:  "It's about time to have

another one," he explained.  "When the niggers get so that they

are afraid of being lynched, it's time to put fear in them."

How could hate, fear, or whatever it was, transform

genteel, God-fearing God-loving Mississippians into mindless

murderers and sadistic torturers?  I ask that same question

about the events which bring us here together today.  Those

crimes of the past as well as these have so damaged the psyche

and reputation of this great state.

You see, Mississippi soil has been stained with the

blood of folk whose names have become synonymous with the civil

rights movement like Emmett Till, like Willie McGee, James

1    Chaney, Andrew Goodman, Michael Schwerner, Vernon Dahmer,

2    George W. Lee, Medgar Evers, even Mack Charles Parker.  But the

3    blood of lesser known people like Luther Holbert and his wife,

4    Elmo Curl, Lloyd Clay, John Hartfield, Lamar Smith, Clinton

5    Melton, Ben Chester White, Wharlest Jackson and countless

6    others, their blood saturates these 48,434 square miles that we

7    call Mississippi.

8         On June 26, 2011, four days short of his birthday, the

9    blood of James Anderson was added to Mississippi soil.  The

10   common denominator of the deaths of these individuals was not

11   their race.  It was not that they were all -- it's not that

12   they were all than engaged in freedom fighting.  As we know,

13   Michael Schwerner and Andrew Goodman were not black.  It was

14   not that they had been engaged in criminal activity, trumped up

15   other otherwise.  No, the common denominator was that the last

16   thing that each of these individuals saw was the inhumanity of

17   racism.  The last thing that each felt was the audacity and

18   agony of hate, senseless hate:  crippling, maiming its victims

19   and finally taking away their lives.

20        Mississippi has a tortured past, and it has struggled

21   mightily to reinvent itself and become a new Mississippi.  New

22   generations have attempted to pull Mississippi from the abyss

23   of moral depravity in which it once so proudly floundered in.

24   Despite much progress and the effort of the new generations,

25   these three defendants are before me today:  Deryl Paul Dedmon,

Dylan Wade Butler, and John Aaron Rice.  They and their

coconspirators ripped off the scab of the healing scars of

Mississippi causing her, our Mississippi, to bleed again.

Hate comes in all shapes, sizes, colors, and from this

case, we know it even comes in different sexes and ages.  A

toxic mix of alcohol, foolishness, and unadulterated hatred

caused these young people to resurrect a nightmarish specter of

lynches and lynch mobs from the Mississippi we long to forget.

Like the marauders of ages past, these young people

conspired, planned, and coordinated a plan of attack on certain

neighborhoods in the city of Jackson for the sole purpose of

harassing, terrorizing, physically assaulting, and causing

bodily injury to black folks.  They punched them.  They kicked

them about their bodies, their head, and their faces.

These children, these kids, these young adults, they

prowled.  They came to hurt.  They used dangerous weapons.

They targeted the weak.  They recruited and encouraged others

to join in the coordinated chaos, and they boasted about their

shameful activity.  This was a 2011 version of the nigger

hunts.

Though the media and the public intention of these

crimes have been focused almost exclusively on the early

morning hours of June 26, 2011, the defendant's terror campaign

is not limited to this one incident.  There were many scenes

and many actors in this sorted tale which played out over days,

weeks and months.  There are unknown victims like the John Doe

at the golf course who begged for his life, and the John Doe at

the service station.  Like a lynching, for these young folk

going out to "Jafrica" was like a carnival outing.  It was

funny to them, an excursion which culminated in the death of an

innocent African-American man, James Craig Anderson.

On June 26, 2011, the fun ended.  But even after

Anderson's murder, the conspiracy continued, and only because

of a video which told a story different from that which had

been concocted by these defendants and the capable and able

investigation of law enforcement, state and federal, in a new

Mississippi, law enforcement working together.  That's when the

truth was uncovered.

What is so disturbing and so shocking and even so

numbing is that these "nigger hunts" were perpetrated by our

children, students who live among us, educated in our public

schools, our private academies, students who played football,

lined up on the same side of the scrimmage line with black

teammates, average students, honor students, kids who worked

during school and in the summers, kids who had full-time jobs,

and some of whom were unemployed.  Some were even pursuing

higher education, and the court believes that each of them had

dreams that they wanted to pursue.

These children, these students, these kids, they were

from two parent homes.  Some of them were children of divorced

1  parents.  And, yes, some were even raised by a single parent.

2  No doubt they all had loving parents and loving families.

3       In letters received on his behalf, Dylan Butler, whose

4  outing on the night of June 26th was not his first, has been

5  described as, "a fine young man," "a caring person," "a

6  well-mannered man," who is truly remorseful and wants to move

7  on with his life.  Very respectable, a good man, a good person,

8  a loveable, kind-hearted teddy bear who stands in front of

9  bullies and who is now ashamed of what he did.

10      Butler's family is a mixed-race family.  For the last

11  15 years, it has consisted of an African-American stepfather

12  and stepsister plus his mother and two sisters.  The family,

13  according to his stepfather, understandably is "saddened and

14  heartbroken."

15      These were everyday students like John Aaron Rice who

16  got out of his truck, struck James Anderson in the face and

17  kept him occupied while others arrived.  Rice was involved in

18  multiple excursions to so-called "Jafrica," but for some time,

19  according to him and his mother, he and an African-American

20  friend shared the same home address.

21      And, sadly, Deryl Dedmon, who straddled James Anderson

22  and struck him repeatedly in the face and head with his closed

23  fist, he too was a normal kid, normal young man,

24  indistinguishable in so many ways from his peers.  But not

25  completely satisfied with the punishment to which he subjected

Mr. Anderson, he "deliberately used his vehicle to run over James Anderson, killing him." Dedmon now acknowledges he was filled with anger.

I asked this question earlier, but what could transform these young adults, these children, these kids into violent creatures that their victims obviously saw? It was nothing that the victims did. Again they were not championing any cause, political, social, economic, nothing they did, not a wolf whistle, not a supposed crime, nothing they did. There's absolutely no doubt in the mind and in the view of this court that the victims were targeted because of their race.

The simple fact is that what turned these children, these kids, these young adults into criminal defendants was their joint decision to act on racial hatred. In the eyes of these defendants and their coconspirators, the victims obviously were doomed at birth. Their genetic makeup made them targets.

In the name of White Power, these young folks went to "Jafrica" to "fuck with niggers." This is the finding that the court has made through the guilty plea. Echoes of Mississippi's past. White Power. Nigger. According to the Fifth Circuit Court of Appeals, that word "nigger" is the "universally recognized opprobrium, stigmatizing African Americans because of their race." It's the nuclear bomb of racial epithets, as Farai Chideya has described it. With their

words, with their actions, "I just ran that nigger over."
There's no doubt that these crimes were motivated by race of
the victims.  And from his own pen, Dedmon sadly and
regretfully wrote that he did it out of "hatred and bigotry."

The court must respond, I believe, to at least one
letter that it received from a person who identifies himself as
a youth leader in the church of Dylan Butler's, a mentor.  He
says and he describes Dylan "as a good person," point well
taken.  The point that, "There are plenty of criminals that
deserve to be incarcerated," that's a point well taken too.
But your point that Dylan is not one of them, not a criminal,
is belied by the facts and the law.  Dylan was an active
participant in this activity, and he deserves to be
incarcerated under the law.

What these defendants did is ugly.  It was painful.
It is sad.  And it is indeed criminal.

In the Mississippi that we have tried to bury, when
there was a jury verdict for those who perpetrated crimes and
committed lynches in the name of White Power, that verdict
typically came back and said that the victim died at the hands
of persons unknown.  The legal and criminal justice system in
the Mississippi we want to forget operated with ruthless
efficiency in upholding what these defendants would call White
Power.

Today, though, the criminal justice system, state and

federal, has proceeded methodically, patiently, and deliberately seeking justice.  Today we've learned and we knew at that guilty plea hearings who the identities of the persons unknown are, and they have stood before us today publicly.

The sadness of this day also has an element of irony to it.  Each defendant was escorted into this court by agents of an African-American U.S. Marshal, having been prosecuted by a team of lawyers which includes an African-American AUSA, Assistant U.S. Attorney, from an office headed by an African-American U.S. Attorney, all under the direction of an African-American Attorney General, for sentencing before a judge who is also African American.  And my final act will be to turn these defendants over to the care and custody of the Bureau of Prison, an agency headed by an African American.

See, today we take another step away from Mississippi's tortured past.  We move farther away from the abyss.  Indeed, Mississippi is a place and a state of mind. And those who think they know about her people and her past will also understand that her story, our Mississippi story, has not been completely written.

Mississippi does have a present and a future, and that present, that future has promise, as demonstrated by the work of the officers within these state and federal agencies.  Black and white, male and female, in this Mississippi they work together to advance the rules of law.  Having learned from

Mississippi's inglorious past, these officials know that in advancing the rule of law the criminal justice system must operate without regard to race, creed or color. This I believe is the strongest way that Mississippi can reject those notions, those ideas, which brought us here today.

At their guilty plea hearings, Deryl Paul Dedmon, Dylan Wayne Butler and John Aaron Rice told the world exactly what their roles were. It is ugly. It is painful. It is sad. And it is criminal.

The court will now sentence Mr. Butler. Could you come forward, please.

Having considered the motions that the court -- that have been filed and having considered the facts of this case and the law and the advisory guidelines, all the factors under 18 USC 3553 -- and I'll say something else about that shortly after each -- after I have talked -- after I have imposed sentence on each defendant -- it is judgment of the court that the defendant Dylan Wayne Butler serve a term of 60 months as to Count 1 and an 84-month term of imprisonment as to Count 2, and those terms will run concurrently.

The term of imprisonment shall immediately be followed by a three-year term of supervised release as to each count to run concurrent to each other and subject -- subject to the standard and mandatory conditions as listed on the judgment order. The court finds that the defendant does not have the

ability to pay a fine and no fine is ordered.  It is ordered

that the defendant pay a special assessment fee of $200, $100

per count, which is due immediately.  The court, as I indicated

earlier, will impose -- restitution is ordered in an amount to

be determined at a separate hearing.  That is your sentence,

Mr. Butler.

MS. BRUMLEY:  Thank you, Your Honor.

THE COURT:  Mr. Rice.  With respect to this defendant,

the court has considered all the matters before it and the

sentencing guidelines and all the factors under 18 USC 3553(a),

and it is the judgment of this court that the defendant John

Aaron Rice is sentenced to a term -- to a 60-month term of

imprisonment as to Count 1 and a 222-month term of imprisonment

to Count 2 to run concurrently.

The term of imprisonment shall be followed by a

three-year term of supervised release as to Counts 1 and 2 to

run concurrently.  These terms of supervised release are

subject to the standard and mandatory conditions as listed on

the judgment order in addition to the following special

condition:  The defendant shall participate in a program of

treatment for alcohol abuse as directed by the probation

office.  If enrolled in an alcohol treatment program, the

defendant shall abstain from consuming alcoholic beverages

during treatment and shall continue abstaining for the

remaining period of supervision.  The defendant shall

1    contribute to the cost of treatment in accordance with the

2    probation office's copayment policy.

3         The court finds that the defendant does not have the

4    ability to pay a fine and no fine is ordered.  It is further

5    ordered that the defendant pay a special assessment fee of

6    $200, which is due immediately.  That is your sentence,

7    Mr. Rice.

8         I am going call Mr. Butler back up because I —— that's

9    Mr. Rice's sentence.  I call Mr. Butler back up because I want

10   to impose the same condition because I've talked about the

11   toxic mix of alcohol and all of that.  So this defendant too

12   shall participate in a program —— this defendant being

13   Mr. Dylan Wayne Butler —— in a program of treatment for alcohol

14   abuse as directed by the probation office.  If enrolled in an

15   alcohol treatment program, the defendant shall abstain from

16   consuming alcoholic beverages during treatment and shall

17   continue abstaining for the remaining period of supervision.

18   The defendant shall contribute to the cost of treatment in

19   accordance with the probation office's copayment policy.

20        Now, that is your complete sentence, Mr. Butler.

21        Mr. Dedmon.  The court has considered the advisory

22   guideline computations and the sentencing factors as well as

23   all the evidence before it, including the various motions that

24   have been filed.  And it is the judgment of the court that the

25   defendant, Deryl Paul Dedmon, is sentenced to a 60-month term

of imprisonment as to Count 1 and a 600-month term of

imprisonment to Count 2 to run concurrently.

This sentence shall run concurrently with the sentence

imposed in Hinds County, Mississippi, Circuit Court cause

number 11-1-260.

The term of imprisonment shall be followed by a

three-year term of supervised release as to Count 1, and a

five-year term of supervised release as to Count 2 to run

concurrently. These terms of supervised release are subject to

the standard and mandatory conditions as listed on the judgment

order in addition to the following special conditions:

The defendant shall participate in a program of

testing and/or treatment for alcohol, drug abuse as directed by

the probation office. If enrolled in an alcohol drug treatment

program, the defendant shall abstain from consuming alcoholic

beverages during treatment and shall continue abstaining for

the remaining period of supervision. The defendant shall

contribute to the cost of treatment in accordance with the

probation office copay payment policy.

The court finds that the defendant does not have the

ability to pay a fine and no fine is ordered. It is further

ordered that the defendant pay a special assessment fee of

$200 -- that's $100 per count -- which is due immediately.

That's your sentence, Mr. Dedmon.

As the court has noted, it has considered the advisory

1  guideline computations and the sentencing factors under

2  18 USC 3553(a).  The court has considered these defendants'

3  history and their characteristics.  The court has also

4  considered the unusual circumstances, the extraordinary

5  circumstance of this case, and the peculiar seriousness and

6  gravity of the offenses that they committed.

7          I've paid special attention to the plea agreements and

8  the recommendations of the United States.  I believe that these

9  sentences -- excuse me.  I also want to note that I've read

10 every letter they are made a part of the file kept under seal.

11 I have read every letter that's been submitted on behalf of any

12 department and all of the defendants.

13         I believe these sentences provide just punishment to

14 each of these defendants and equally important I believe that

15 these sentences will serve as an adequate deterrent to others,

16 and I hope that these sentences will discourage others from

17 heading down a similar path, a similar life-altering path.  I

18 have considered the sentencing guidelines and its policy

19 statements.

20         These sentence are the result of much thought and

21 deliberation.  These sentences will not will not bring back

22 James Craig Anderson nor will they restore to these defendants

23 the lives they enjoyed prior to 2011.  This court knows now

24 that James Anderson's mother is still alive and she's 89 years

25 old.  She lived through the horrors of the old Mississippi, and

1   the court hopes that she and her family can find peace in

2   knowing that with these sentences in the new Mississippi,

3   justice is truly blind.  Justice, however will not be complete

4   unless these defendants -- each of these defendants -- used the

5   remainder of their lives to learn from this experience and

6   fully commit to making a positive difference in the new

7   Mississippi.

8           Finally, the court wishes for these defendants too,

9   that they also find peace.

10          Turning to probation, is there anything further from

11  probation?

12          PROBATION OFFICER:  No, Your Honor.

13          THE COURT:  Is there anything further from the

14  government?

15          MR. BEER:  No, Your Honor.  Thank you.

16          THE COURT:  Is there anything further from the

17  defendants?

18          MS. BRUMLEY:  No, Your Honor.

19          MR. MARTIN:  No, Your Honor.

20          MS. STEWART:  No, Your Honor.

21          THE COURT:  The defendants are remanded to the custody

22  of the United States Marshal to be turned over to the custody

23  of the Bureau of Prisons.  This concludes this matter for

24  today.  Court is adjourned.

25      (Recess)

1          CERTIFICATE OF REPORTER

2

3          I, CHERIE GALLASPY BOND, Official Court Reporter, United

4    States District Court, Southern District of Mississippi, do

5    hereby certify that the above and foregoing pages contain a

6    full, true and correct transcript of the proceedings had in the

7    aforenamed case at the time and place indicated, which

8    proceedings were recorded by me to the best of my skill and

9    ability.

10         I certify that the transcript fees and format comply

11   with those prescribed by the Court and Judicial Conference of

12   the United States.

13

14         This the 23rd day of August, 2015.

15

16                        s/ *Cherie G. Bond*
                          Cherie G. Bond
17                        Court Reporter

18

19

20

21

22

23

24

25